# UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |
|---|---|
| In the Matter of the Search of:<br>Information associated with the accounts identified as<br>luisb843@gmail.com; adriandez8e@gmail.com; and<br>ebarragan095@gmail.com that are within the<br>possession, custody, or control of Google, LLC | ) ) ) ) ) |

Case No. 2:20-MJ-03458

## APPLICATION FOR WARRANT PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

- ☑ Evidence of a crime;
- ☑ Contraband, fruits of crime, or other items illegally possessed;
- ☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| Code Sections | Offense Descriptions |
|---|---|
| 18 U.S.C. § 2251(a), (e) | Production of Child Pornography |
| 18 U.S.C. § 2252A(a)(2)(A),(b)(1) | Receipt and Distribution of Child Pornography |
| 18 U.S.C. § 2252A(a)(5)(B),(b)(2) | Possession of Child Pornography |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

_____
*/s/ Garret Sumpter*
*Applicant's signature*

Garret Sumpter, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

City and State: _____

_____
*Judge's signature*

Hon. Pedro Castillo, U.S. Magistrate Judge
*Printed name and title*

AUSA: J. Axelrad (x7964)

**AFFIDAVIT**

I, Garret Sumpter, being duly sworn, declare and state as follows:

**I.   INTRODUCTION**

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since September 15, 2019.  I received my initial training and instruction to become a Special Agent during the 21-week-long course at the FBI Academy located in Quantico, Virginia.  During my training at the FBI Academy, I received extensive training in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause.

2.   After initial training, I was assigned to the Lancaster Resident Agency, Los Angeles Field Office.  I currently work a variety of criminal and national security matters, including the investigation of violent crimes against children, including the investigation of child sexual abuse material ("CSAM").  Throughout these investigations, I have become familiar with how cellular telephones and electronic communications are used to assist individuals participating in criminal activity.

3.    I make this affidavit in support of applications for warrants for information associated with the following accounts that are stored at the premises controlled by Google LLC, a provider of electronic communication and remote computing services, headquartered at Custodian of Records, 1600 Amphitheatre Parkway, Mountain View, California 94043[1]:

       a.    luisb843@gmail.com ("SUBJECT ACCOUNT 1").

       b.    adriandez8e@gmail.com ("SUBJECT ACCOUNT 2").

       c.    ebarragan095@gmail.com ("SUBJECT ACCOUNT 3")

(collectively, the "SUBJECT ACCOUNTS")

4.    The information to be searched is described in Attachment A.  This affidavit is made in support of applications for warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require Google to disclose to the

_____

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel Google pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A).  See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

[2] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d).  To obtain the basic subscriber information, which does not contain content, the government needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To

government copies of the information (including the content of communications) described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section II of Attachment B.  Attachments A and B are incorporated herein by reference.

5.   As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the SUBJECT ACCOUNTS constitutes evidence, contraband, fruits, or instrumentalities of criminal violations, namely, production of child pornography, in violation of 18 U.S.C. § 2251(a),(e); receipt/distribution of child pornography, in violation of 18 U.S.C. § Section 2252A(a)(2)(A),(b)(1); and possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B),(b)(2) (collectively, the "SUBJECT OFFENSES").

---

obtain additional records and other information--but not content--pertaining to subscribers of an electronic communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The requested warrant calls for both records containing content as well as subscriber records and other records and information that do not contain content.

6.    The information set forth in this affidavit was
obtained during the course of my employment with the FBI,
through personal observations, subject statements, information
supplied by other local and federal law enforcement officers,
and through other investigative activity.   This affidavit is
intended to show merely that there is sufficient probable cause
for the requested warrant and does not purport to set forth all
of my knowledge of or investigation into this matter.   Unless
specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II.   <u>SUMMARY OF PROBABLE CAUSE</u>

7.    From 2018 through 2019, two separate female victims,
ages seven and eight, were sexually exploited by a user on the
social media app "Like."   Based on the investigation that
followed, law enforcement has identified Luis BARRAGAN as the
individual responsible for sexually exploiting these minor
victims and as the user of the SUBJECT ACCOUNTS.   In interviews
with law enforcement on February 12 and 27, 2020, BARRAGAN
provided consent to search his cell phone and assume the online
identity of the SUBJECT ACCOUNTS.   During a preview of
BARRAGAN's cell phone and the SUBJECT ACCOUNTS, law enforcement
located more than 900 images of suspected CSAM.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.   <u>New York victim on app "Like"</u>**

8.    Based on my training and experience, and conversations with other law enforcement agents and officers, as well as my familiarity with this investigation, I am aware of the following:

a.    During the summer of 2018, the father of an eight-year-old female residing in Amityville, New York contacted the Federal Bureau of Investigation ("FBI") to report that his daughter was being enticed to take pornographic images and/or videos of herself by at least one adult male on the social media app "Like."

b.    A preliminary forensic review of the victim's phone conducted by law enforcement revealed multiple images and/or videos of suspected CSAM sent from the victim on the social media app "Like."  Additionally, the review found multiple images and/or videos of an adult male masturbating as well as sexually explicit messages.  Law enforcement identified the account name "Felipe Dias" as one of the users who had contacted the victim on "Like" in an attempt to entice her to produce additional CSAM.

c.    "Like" is hosted by the company Bigo Technology Pte. Ltd., located in Singapore.  Working in conjunction with the Singapore Police Force, the United Sates Embassy in

Singapore was able to obtain the IP address for the account name "Felipe Dias" from Bigo Technology Pte. Ltd.  The IP address for the account name "Felipe Dias" came back to 99.100.6.94.

      d.   On November 8, 2018, in response to an administrative subpoena, AT&T returned subscriber data from IP address 99.100.6.94 which came back to Luis BARRAGAN, located at 24838 Newhall Avenue, Apt. 10, Santa Clarita, CA 91321.

**B.   <u>Georgia victim on app "Like"</u>**

9.   Based on my training and experience, and conversations with other law enforcement agents and officers, as well as my familiarity with this investigation, I am aware of the following:

      a.   On June 4, 2019, the mother of a seven-year-old female residing in Leesburg, Georgia contacted law enforcement to report that an unknown person with the account name "Huskies" sexually exploited her daughter on the social media app "Like."

      b.   On July 31, 2019, law enforcement obtained a search warrant filed in Lee County, Georgia, and in response Bigo Technology Pte. Ltd. provided IP address logs from the account name "Huskies."  According to the IP address logs, the IP address 99.100.6.94 is registered to the account name "Huskies."  Furthermore, between the dates of March 12, 2019 and July 25, 2019, the 99.100.6.94 IP address accessed the account name "Huskies" over 5,000 times.

c.   On March 9, 2020, law enforcement obtained a search warrant in Lee County, Georgia, and in response AT&T returned subscriber data from IP address 99.100.6.94 which came back to BARRAGAN, telephone number 661-644-2776, located at 24838 Newhall Avenue, Apt. 10, Santa Clarita, CA 91321.

**C.   Preview of Samsung Galaxy S8 smartphone**

10.   Based on my training and experience, and conversations with other law enforcement agents and officers, as well as my familiarity with this investigation, I am aware of the following:

a.   On February 12, 2020, law enforcement interviewed BARRAGAN outside of his residence.  BARRAGAN stated that he accessed the Internet via his home WiFi network using his Samsung Galaxy S8 smartphone.  BARRAGAN stated that he used several social media apps including Snapchat, Facebook, Instagram, WhatsApp, TikTok, Funimate, and Like.  BARRAGAN stated that he used the account name "Felipe Dias" on the social media app "Like" to chat and trade pornographic images and/or videos with anonymous individuals.

b.   BARRAGAN gave both verbal and written consent for law enforcement to search his Samsung Galaxy S8 smartphone.  Law enforcement subsequently located approximately four images depicting pre-adolescent naked females exposing their vagina and

buttocks.  As a result of the discovery of suspected CSAM, law enforcement seized BARRAGAN's Samsung Galaxy S8 smartphone.

      c.  On May 26, 2020 and May 27, 2020, pursuant to receiving consent to search, I conducted a preview of the Cellebrite extraction files from BARRAGAN's Samsung Galaxy S8 smartphone.  Based on my preview, I identified approximately 52 images of suspected CSAM that were located in the image folder of BARRAGAN's Samsung Galaxy S8 smartphone.  The images of suspected CSAM included pre-adolescent females exposing their chest, vagina, and buttocks.

      **D.**    **Preview of Google accounts**

11.  Based on my training and experience, and conversations with other law enforcement agents and officers, as well as my familiarity with this investigation, I am aware of the following:

      a.  During the February 12, 2020 interview, BARRAGAN provided consent for law enforcement agents to search and assume the online identity of luisb843@gmail.com ("SUBJECT ACCOUNT 1").

      b.  On June 3, 2020, pursuant to receiving consent to search, I conducted a preview of SUBJECT ACCOUNT 1.  During my preview of SUBJECT ACCOUNT 1, I identified approximately seven outgoing e-mails containing suspected CSAM.  The images of suspected CSAM included the following:

       i.   Four e-mails containing approximately 15 images and approximately four videos depicting suspected CSAM that were sent from SUBJECT ACCOUNT 1 to adriandez8e@gmail.com ("SUBJECT ACCOUNT 2") between approximately November 16, 2019 and December 13, 2019.  These 15 images appear to depict naked pre-adolescent females exposing their chest, vagina, and buttocks.  The four videos appear to depict pre-adolescent females removing their clothing and masturbating.  One video appears to be from the social media app "Funimate."

       ii.   Three e-mails containing approximately 23 images depicting suspected CSAM that were sent from SUBJECT ACCOUNT 1 to ebarragan095@gmail.com ("SUBJECT ACCOUNT 3") between approximately March 13, 2018 and March 26, 2018.  These 23 images all appear to depict the same naked pre-adolescent female.

      c.   In a subsequent interview conducted on February 27, 2020, BARRAGAN provided consent for law enforcement agents to search and assume the online identities for SUBJECT ACCOUNT 2 and SUBJECT ACCOUNT 3.

      d.   On May 27, 2020, May 28, 2020, and June 3, 2020, pursuant to receiving consent to search, I conducted a preview of SUBJECT ACCOUNT 2.  During my preview of SUBJECT ACCOUNT 2, I identified approximately 900 images of suspected CSAM located in the image folder.  These images appear to depict pre-adolescent

females exposing their chest, vagina, and buttocks.  The images of CSAM had a file creation date ranged between April 2018 and November 2019.

      e.  Most of the images of suspected CSAM in SUBJECT ACCOUNT 2 appeared to be uploaded from an Android device.  At least one image from SUBJECT ACCOUNT 2 ("Screenshot_20190422-155643_LIKE.jpg") appeared to match an image found during a previous preview of BARRAGAN's Samsung Galaxy S8 smartphone.

      f.  At least two images from SUBJECT ACCOUNT 2 ("Screenshot_20190525-113751_LIKE.jpg" and "Screenshot_20190525-113457_LIKE.jpg") appeared to match images of the seven-year-old female victim, previously identified by the LCSO, located in Leesburg, Georgia.  Both of these images had file creation dates of May 25, 2019, which was approximately ten days prior to law enforcement receiving the initial victim report.  One image depicted a pre-adolescent female exposing her chest and the other image depicted a pre-adolescent female completely naked.  Furthermore, SUBJECT ACCOUNT 2 contained a screenshot from the social media app "Like" that depicted non-pornographic images resembling this same female victim.

      g.  SUBJECT ACCOUNT 2 also contained numerous screenshots of sexually explicit chat conversations containing suspected CSAM.  In the chat conversations, an individual instructed various female victims to remove their clothing and

engage in sexually explicit conduct.  Many of the chat conversations were conducted using the social media app "Like" and involved the user "Huskies."

       h.   In one chat conversation, an unknown user asked "Do you still want some pics or no(?)" to which "Huskies" confirmed.  The user then asked "naked(?)" to which "Huskies" again confirmed.  The unknown user then sent an image depicting suspected CSAM.  In another chat conversation, an unknown user sent an image depicting suspected CSAM, to which "Huskies" replied "video finger in."  When the user sent another image of suspected CSAM, "Huskies" replied "2 fingers."

       i.   In addition to the images of suspected CSAM and chat conversations, SUBJECT ACCOUNT 2 also contained non-pornographic images depicting young females from approximately 75 social media accounts.  These social media platforms included: Like, Snapchat, Instagram, and TikTok.

## IV.  <u>BACKGROUND ON E-MAIL AND SOCIAL MEDIA ACCOUNTS AND THE PROVIDERS</u>

26.  In my training and experience, I have learned that providers of e-mail and/or social media services offer a variety of online services to the public.  Providers, like Google, allow subscribers to obtain accounts like the SUBJECT ACCOUNTS.  Subscribers obtain an account by registering with the provider.  During the registration process, providers generally ask their

subscribers to provide certain personal identifying information
when registering for an e-mail or social media account.  Such
information can include the subscriber's full name, physical
address, telephone numbers and other identifiers, alternative
e-mail addresses, and, for paying subscribers, means and source
of payment (including any credit or bank account number).  Some
providers also maintain a record of changes that are made to the
information provided in subscriber records, such as to any other
e-mail addresses or phone numbers supplied in subscriber
records.  In my training and experience, such information may
constitute evidence of the crimes under investigation because
the information can be used to identify the user(s) of an
account.

27.  Therefore, the computers of Google are likely to
contain stored electronic communications and information
concerning subscribers and their use of Google's services, such
as account access information, e-mail or message transaction
information, and account application information.  In my
training and experience, such information may constitute
evidence of the crimes under investigation because the
information can be used to identify the user(s) of a SUBJECT
ACCOUNT.

28.  A subscriber of Google can also store with Google
files in addition to e-mails or other messages, such as address

books, contact or buddy lists, calendar data, pictures or videos
(other than ones attached to e-mails), notes, and other files,
on servers maintained and/or owned by Google.  In my training
and experience, evidence of who was using an account may be
found in such information.

29.  In my training and experience, e-mail and social media
providers typically retain certain transactional information
about the creation and use of each account on their systems.
This information can include the date on which the account was
created, the length of service, records of login (i.e., session)
times and durations, the types of service utilized, the status
of the account (including whether the account is inactive or
closed), the methods used to connect to the account (such as
logging into the account via the provider's website), and other
log files that reflect usage of the account.  In addition,
e-mail and social media providers often have records of the
Internet Protocol ("IP") address used to register the account
and the IP addresses associated with particular logins to the
account.  Because every device that connects to the Internet
must use an IP address, IP address information can help to
identify which computers or other devices were used to access a
SUBJECT ACCOUNT.

30.  In my training and experience, e-mail and social media
account users will sometimes communicate directly with the

13

service provider about issues relating to the account, such as
technical problems, billing inquiries, or complaints from other
users.  Providers of e-mails and social media services typically
retain records about such communications, including records of
contacts between the user and the provider's support services,
as well records of any actions taken by the provider or user as
a result of the communications.  In my training and experience,
such information may constitute evidence of the crimes under
investigation because the information can be used to identify
the user(s) of a SUBJECT ACCOUNT.

31.  I know from my training and experience that the
complete contents of an account may be important to establishing
the actual user who has dominion and control of that account at
a given time.  Accounts may be registered in false names or
screen names from anywhere in the world with little to no
verification by the service provider.  They may also be used by
multiple people.  Given the ease with which accounts may be
created under aliases, and the rarity with which law enforcement
has eyewitness testimony about a defendant's use of an account,
investigators often have to rely on circumstantial evidence to
show that an individual was the actual user of a particular
account.  Only by piecing together information contained in the
contents of an account may an investigator establish who the
actual user of an account was.  Often those pieces will come

from a time period before the account was used in the criminal
activity.  Limiting the scope of the search would, in some
instances, prevent the government from identifying the true user
of the account and, in other instances, may not provide a
defendant with sufficient information to identify other users of
the account.  Therefore, the contents of a given account,
including the e-mail addresses or account identifiers and
messages sent to that account, often provides important evidence
regarding the actual user's dominion and control of that
account.  For the purpose of searching for content demonstrating
the actual user(s) of the SUBJECT ACCOUNTS, I am requesting
warrants requiring Google to turn over all information
associated with the SUBJECT ACCOUNTS with the date restriction
included in Attachment B for review by the search team.

32.  Relatedly, the government must be allowed to determine
whether other individuals had access to the SUBJECT ACCOUNTS.
If the government were constrained to review only a small
subsection of an account, that small subsection might give the
misleading impression that only a single user had access to the
account.

33.  I also know based on my training and experience that
criminals discussing their criminal activity may use slang,
short forms (abbreviated words or phrases such as "lol" to
express "laugh out loud"), or codewords (which require entire

15

strings or series of conversations to determine their true meaning) when discussing their crimes.  They can also discuss aspects of the crime without specifically mentioning the crime involved.  In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parenthesis :) to convey a smile or agreement) to discuss matters.  "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures set forth in Attachment B, is necessary to find all relevant evidence within the account.

34.  In my training and experience, providers also keep a record of search queries run by the user of the account, whether searches within the services of the provider for persons, content, or other accounts (such as if a user is trying to find the account of an acquaintance), or broader Internet searches. In some instances, providers may also keep records of which websites or contents were "clicked on" as a result of these searches.  This information is helpful both in the context of the case to show the topics about which the user was trying to

obtain more information or conduct research, and is relevant for "user attribution" evidence, analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

35.  I know based on my training and experience that providers of e-mail or social media services generally have access to and store the web or Internet browsing history of the user while he or she is logged into an account.  That history can include names and specific websites or URLs/URIs (Uniform Resource Locators or Indicators) of the sites that have been visited.  Obtaining web browsing history can potentially identify the source(s) or websites used to purchase, hack, or otherwise acquire victim information.

36.  I know based on my training and experience that providers of e-mail or social media services will often keep track of what is referred to as user agent string, which contains information about the type of computer, operating system, and web browser used to access the service.  User agent string can include:  web requests or HTTP requests (hypertext transfer protocol is the protocol by which many web pages are transmitted between servers and clients or users); logs containing information such as the requestor's IP address, identity and user ID, date and timestamp, request URL or URI (Uniform Resource Locator or Indicator, i.e., a website

address), HTTP protocol version, referrer, and similar information; login tracker logs; account management logs; and any other e-mail or social media accounts accessed by or analytics related to the SUBJECT ACCOUNTS.  These can be used to determine the types of devices used while accessing the SUBJECT ACCOUNTS, as well as data related to the user's activity while accessing the SUBJECT ACCOUNTS.

38.  I have also learned that providers of e-mail and social media services often track the behavior and activities of persons using accounts by using cookies, which are strings of characters and numbers stored on a person's computer on their web browser.  These cookies can often show whether more than one account was accessed by the same computer (and specifically the same web browser), as the provider can recognize that cookie when the same device returns to the service to access an account.

39.  In order to identify other accounts used or maintained by the user of the SUBJECT ACCOUNTS, the warrants also call for Google to disclose both (1) any cookies associated with a SUBJECT ACCOUNTS, i.e., those cookies that were placed on any computers or web browsers (for example, Internet Explorer or Google Chrome) used to access the SUBJECT ACCOUNTS, and (2) the identity of any other account in which the same cookie or cookies used to access the SUBJECT ACCOUNTS was/were recognized.

If in the course of the investigation the digital devices used by the subject(s) of the investigation are found, they can be searched to determine if the cookies recognized by the provider are stored on those devices.  The warrants also call for Google to identify any other accounts accessed by any computer or web browser using the same cookies as the SUBJECT ACCOUNTS by providing subscriber records and log-in information for those other accounts (but not to provide the contents of communications in those other accounts).

40.  This application seeks warrants to search all responsive records and information under the control of Google, which are subject to the jurisdiction of this court, regardless of where Google has chosen to store such information.

41.  As set forth in Attachment B, I am requesting warrants that permit the search team to keep the original productions from Google, under seal, until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

a.   I make that request because I believe it might be impossible for a provider to authenticate information taken from a SUBJECT ACCOUNT as its business record without the original production to examine.  Even if the provider kept an original copy at the time of production (against which it could compare the results of the search at the time of trial), the government

19

cannot compel the provider to keep a copy for the entire
pendency of the investigation and/or case.  If the original
production is destroyed, it may be impossible for the provider
to examine a particular document found by the search team and
confirm that it was a business record of the provider taken from
a SUBJECT ACCOUNT.

   b.  I also know from my training and experience that
many accounts are purged as part of the ordinary course of
business by providers.  For example, if an account is not
accessed within a specified time period, it -- and its contents
-- may be deleted.  As a consequence, there is a risk that the
only record of the contents of an account might be the
production that a provider makes to the government, for example,
if a defendant is incarcerated and does not (perhaps cannot)
access his or her account.  Preserving evidence, therefore,
would ensure that the government can satisfy its Brady
obligations and give the defendant access to evidence that might
be used in his or her defense.

### V. SERVICES PROVIDED BY GOOGLE LLC

 42.  The SUBJECT ACCOUNTS have signed up for the following
Google LLC services: Gmail.

 43.  In my training and experience, I have learned that
Google provides a variety of online services, including e-mail,
document storage, mobile operating systems, translation

services, software coding tools, malware analysis, social media
accounts, applications development tools, video and photograph
sharing and storage, web feed management tools, personalized
home pages, news aggregation tools, a Google account "dashboard"
tool, an online retail storefront offering applications for free
and for sale, website analytic tools, calendars, web browsers,
mapping tools, location tracking tools, and telephone and
voicemail transcription to the public.

44.   Google offers numerous services which enhance the
user's Internet experience, including Google Dashboard, Google
Reader, Google News, and Google Groups.  Google News and the
now-discontinued Google Reader are website feed aggregators that
allowed a user to view website articles and news in one
centralized location.  Google Groups are e-mail groups whereby
one person can send an e-mail to an e-mail address that serves
as the "group," and the message or e-mail is either or both
posted to a centralized location and/or sent to everyone who is
currently subscribed to the group via e-mail; each group is
generally set up using a Google account.

45.   Evidence of who it is that a user of an e-mail or
social media account had contacted and for what purpose can also
reside in the information likely stored on a SUBJECT ACCOUNT at
Google.  For example, photographs can be stored not only as
attachments to e-mails, but they can be linked to a particular

contact stored in connection with an e-mail account, they can be stored in connection with a particular "friend" or event on a Google+ account, or they can be stored in a Google Photos (formerly Picasa) web album.  Albums can be compiled for a particular trip or occasion, documenting who was present, when it took place, and where it was -- for example by recovering location information that is sometimes stored in metadata or what is referred to as "EXIF data" on digital photographs. Likewise, personal videos can be uploaded to or downloaded from video services such as Google's YouTube.  All of this data can assist in identifying the true identity of the account user and persons with whom the user of the account has been in contact.

46.  Aside from photos, Google+, Google Plusone, and the discontinued iGoogle are social networking services similar to Facebook.  Data residing on Google+, Google Plusone, and iGoogle accounts is likely to provide information regarding the true identity of the person(s) using a SUBJECT ACCOUNT, the identities of persons with whom the user of a SUBJECT ACCOUNT has been in contact, the nature of those contacts, and whether any such contacts were related to the subject matter of the investigation described above.  Furthermore, a user's history that relates to web browsing, web searches, and certain activity related to Google services or applications (or "apps") are

stored in an account's Google History, or Google Web & App Activity.

47.   In addition to storing photographs, calendars, and other evidence related to social media, a subscriber can also sign up for other services at Google, such as Google Drive and Google Docs, which allow users to store any kind of documents.

48.   Further, Google Maps provides a mapping tool that allows users to save locations, such as their home and work locations, create custom maps, make changes and edits to public places, "star" locations, and create private labels for locations.  Google Location History provides Global Positioning System (GPS) location information.  All of these services can be used to identify where an individual is and has been physically located.  Google also in some instances maintains records of the nearby wireless or "Wi-Fi" access points (that can be used to connect to the Internet) or the cell towers connected to a device that is accessing a Google account.

49.   Google offers services which interpret and translate text, including Google Translate (which allow users to paste text in one language that will be translated into another) and Google Translator Toolkit (which includes more functionality and collaboration), which can translate text in 345 source languages into 345 target languages.  The translation service is Internet-

based, so it can be used by the user of an account to translate
e-mails received as well as websites visited.

50.  Over the last several years, Google has developed a
number of mobile telephone technologies, including the
development of the Android mobile operating system, Android
Market, and Google Talk.  The Android operating system is used
on the majority of the world's touch-screen mobile devices and
smartphones, and facilitates the downloading and running of
games and applications, sending of text and voice messages,
connecting to and searching the Internet, and providing of GPS
and location services, camera services for the taking of
photographs and videos (including video calling), clock and
calendar services, and e-mail services, and storing of contact
lists and documents.  The Google Play service provides the
virtual storefront at which applications can be downloaded and
updated.  Google Talk is an instant messaging service that
provides both text and voice communication.  I know from
experience that Android applications including these are
generally downloaded from the Android Market and Google Play
services.

51.  Google also uses "unique application numbers," which
Google uses to record information such as the operating system
type and the application version number used to access Google by
a particular device.  Google maintains these unique application

24

numbers to track and collect information related to a particular device accessing Google services, which is recognized when updating Google services or software on a device using a Google account.

52.  Google offers a service called Google Hangouts, which allows Google users to communicate by means of video calls, phone or audio calls, or written messages.

53.  Google also offers its own web browser, a program called Google Chrome, which can be used instead of other web browsers such as Microsoft Internet Explorer or Mozilla Firefox. Users who have a Google account can use Google Chrome on multiple devices, and can decide which information "syncs" or synchronizes across multiple devices that are running Google Chrome.  Devices that can be synced include computers, Google's own computers called Chromebooks, devices running Google's own Android operating system, or iPhones or iPads (devices made by Apple, Inc. that use Apple's proprietary operating system). Users have the option to sync all data across multiple devices, or only certain information by checking certain boxes, and can choose to require a passphrase to sync between different computers as well as to encrypt any passwords stored by Google Chrome.

54.  Depending on whether a user of a Google account implemented Google's two-factor authentication system (which can

require the user to enter both a user-name and password and a code sent to one's cell phone), Google may also have authentication logs of when the user successfully authenticated or identified him- or herself when logging into an account. Similarly, for certain mobile devices, a password for the specific "app" installed on the mobile device may be generated and used to maintain access.

55.   For this reason, Attachment B in the requested warrant to Google requires Google to provide information related to any Google service used by a SUBJECT ACCOUNT, as the user/s of the SUBJECT ACCOUNT may have enrolled in new services.

## VI.   REQUEST FOR NON-DISCLOSURE

56.   Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter orders commanding Google not to notify any person, including the subscriber(s) of the SUBJECT ACCOUNTS, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the requested warrants are signed by the magistrate judge, or such later date as may be set by the Court upon application for an extension by the United States.  There is reason to believe that such notification will result in: (1) flight from prosecution; (2) destruction of or tampering with evidence; (3) intimidation of potential witnesses; or

(4) otherwise seriously jeopardizing the investigation. The current investigation set forth above is not public, and I know, based on my training and experience, that targets who engage in dark web identity trafficking and bank fraud often will destroy digital evidence if he/she learns of an investigation. In addition, if Google or other person notifies the target of the investigation that a warrant has been issued for the SUBJECT ACCOUNTS, the target might further mask his activity and seriously jeopardize the investigation.

//

## VII. CONCLUSION

57. Based on the foregoing, I request that the Court issue the requested warrants. The government will execute the warrants by serving the warrants on Google. Because the warrants will be served on Google, who will then compile the requested records at a time convenient to them, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

_____
Garret Sumpter, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn to me via
Telephone on July 24, 2020.

_____
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

The accounts to be searched (the "SUBJECT ACCOUNTS") that are stored at the premises controlled by Google LLC, a provider of electronic communication and remote computing services, headquartered at Custodian of Records, 1600 Amphitheatre Parkway, Mountain View, California 94043:

1. luisb843@gmail.com ("SUBJECT ACCOUNT 1").

2. adriandez8e@gmail.com ("SUBJECT ACCOUNT 2").

3. ebarragan095@gmail.com ("SUBJECT ACCOUNT 3").

## ATTACHMENT B

### ITEMS TO BE SEIZED

I.   **INFORMATION TO BE DISCLOSED BY THE PROVIDER**

1.   To the extent that the information described in Attachment A is within the possession, custody, or control of Google, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to Google, or has been preserved pursuant to requests made under 18 U.S.C. § 2703(f) on February 21, 2020 (reference #3513319) and May 12, 2020 (reference #3724090), Google is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.   Subscriber/registration information to include all contact and personal identifying information, including: full name, user identification number, date of birth, gender, contact e-mail addresses, Google passwords, Google security questions and answers, telephone numbers, physical addresses (including city, state, and zip code), screen names, websites, account creation dates, account status, registration IP address, and other personal identifiers;

i.   Any associated accounts linked to the SUBJECT ACCOUNTS based on machine cookies, SMS phone number, recovery or alternate e-mail address, or creation IP.

b.   The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account numbers);

c.   Device identifiers (IMEI/MEID, serial number, SIM operator, cell operator, and model number, etc.), account identifiers, Android ID, Push Tokens and/or Device Tokens, etc. associated with the SUBJECT ACCOUNTS;

d.   All location data, whether derived from GPS data, cell site/cell tower information, WiFi access points, sensor data, IP addresses, search history, advertising data, metadata (including EXIF) of images and videos, or any other source, including all such data associated with Location Services, Location Reporting, Location History, Web & App Activity, and Google's advertising services (including "locations of interest" and other data used by Google for its ad-targeting services); all information associated with each location record, including the source, date and time, latitude and longitude, estimated accuracy, device and platform, and inferences drawn from sensor data (such as whether a user was at rest, walking, biking, or in a car).  All "check ins" and other location information;

e.   All Google Maps and Waze data, including all saved and starred locations, information associated with search history, locations and other data associated with the use of My Maps and Location Sharing, and the logs and metadata associated

30

with all of the above;

f.    All IP Address logs for all services utilized by the SUBJECT ACCOUNTS, to include: all records of the IP addresses that logged into the account (using authentication credentials), records of session times and durations, login/logout/intra-communication IP addresses associated with session times and date, methods of connecting, and log files;

g.    All images, graphic files, video files, and other media files stored in the SUBJECT ACCOUNTS, including those associated with Google Photos, Google Drive, Gmail, or Google Hangouts, Picasa web albums, and Google+, and associated metadata, logs, and user settings;

h.    All activity relating to Google Play, including, but not limited to records of downloaded, installed, and/or purchased apps (including the identity of the devices from/to each app was downloaded, installed, and/or purchased), payment transactions, and all data associated therewith, including logs and user settings;

i.    Passwords or other protective devices in place and associated with the SUBJECT ACCOUNTS, which would permit access to the content stored therein;

j.    Downloaded, installed, and/or purchased apps along with activity/registration information; and

k.    Contacts stored using the service known as Google

Contacts, including any contacts stored in the service known as Gmail, and any other service where contact lists are maintained.

## II.   INFORMATION TO BE SEIZED BY THE GOVERNMENT

2.   All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of production of child pornography, in violation of 18 U.S.C. § 2251(a),(e); receipt/distribution of child pornography, in violation of 18 U.S.C. § Section 2252A(a)(2)(A),(b)(1); and possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B),(b)(2) (collectively, the "SUBJECT OFFENSES"), that have been committed on SUBJECT ACCOUNTS.

## III.  PROVIDER PROCEDURES

3.   IT IS ORDERED that Google shall deliver the information set forth in Section II within 10 days of the service of this warrant.  Google shall send such information to:

> Garret Sumpter
>
> Special Agent
>
> Federal Bureau of Investigation
>
> 610 W. Avenue L
>
> Lancaster, CA 93534
>
> Phone:  (310) 405-1031
>
> E-mail:  gmsumpter@fbi.gov

4.    IT IS FURTHER ORDERED that Google shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

5.    IT IS FURTHER ORDERED, pursuant to 18 U.S.C § 2705(b), that Google shall not notify any person, including the subscriber(s) of each account identified in Attachment A, of the existence of the warrant, until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date this warrant is signed by the magistrate judge or such later date as may be set by the Court upon application for an extension by the United States.  Upon expiration of this order, at least ten business days prior to disclosing the existence of the warrant, Google shall notify the agent identified in paragraph 3 above of its intent to so notify.